UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BODEY L. COOK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 20 CV 5280 |
| ) | |
| WEXFORD HEALTHCARE SERVICES, ) | Judge Rebecca R. Pallmeyer |
| LaTONYA WILLIAMS, MARLENE HENZE, ) | |
| and JANE DOE, ) | |
| ) | |
| Defendants.[1] ) | |

## MEMORANDUM OPINION AND ORDER

Bodey Cook, an Illinois prisoner, brings this suit under 42 U.S.C. § 1983 against Wexford Healthcare Services, Inc. ("Wexford") and two healthcare professionals employed by Wexford. Cook alleges that Wexford staff were deliberately indifferent to his medical needs during his incarceration at Illinois's Stateville Correctional Center. (Compl. [8] at 4–10.) Cook and Defendants have filed cross motions for summary judgment [81, 84]. For the reasons discussed below, Cook's motion is denied, and Defendants' motion is granted.

## BACKGROUND

Although represented by recruited counsel [66, 68], Plaintiff did not respond to Defendants' Local Rule 56.1 statement of material facts, nor did he file a statement of material facts in support of his own summary judgment motion. Cook did submit an affidavit together with

---

[1] Plaintiff's original *pro se* complaint named two other individual Defendants. On August 12, 2021, then-Judge Feinerman dismissed the case as against Robert Jeffreys and Sherwin Miles [37] because the complaint stated no allegations of any kind against Jeffreys, and Miles's alleged involvement was limited to a single grievance response. Plaintiff has also named a "Jane Doe" Defendant, now identified by the parties as Nurse Lydia Lewandowski [53, 54, 58] in his original complaint and in an amended complaint, but the record does not show service of process on Nurse Lewandowski, and the case is therefore dismissed as against her without prejudice. FED. R. CIV. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.").

his summary judgment motion, attesting that the facts set forth in his motion (which are otherwise unsupported by citations to the record) are true [82-1]. Such an affidavit does not comply with this court's Local Rule 56.1. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633–34 (7th Cir. 2005). The court will therefore credit Defendants' version of the facts, to the extent they are supported in the record, which includes Cook's own deposition testimony. *See* L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015) ("The non-moving party's failure to admit or deny facts as presented in the moving party's statement or to cite to any admissible evidence to support facts presented in response by the non-moving party render the facts presented by the moving party undisputed."). The court notes, in any event, that the facts alleged in Plaintiff's own motion are largely consistent with the facts set forth in Defendant's Rule 56.1 statements.

Bodey Cook, who has been incarcerated since 2011, was housed at the Stateville Correctional Center in Crest Hill, Illinois at all relevant times. (Dep. of Bodey Cook (hereinafter "Cook Dep."), Ex. A to Defs.' Statement of Facts (hereinafter "DSOF") [85-1] at 22:5–8; DSOF ¶¶ 3, 5.) Wexford is a private corporation that has contracted with the State of Illinois to provide medical treatment to individuals housed in the Illinois Department of Corrections. (DSOF ¶ 10.) Dr. Marlene Henze, a Wexford employee, worked full-time as the Medical Director at Stateville at all relevant times. (*Id.* ¶ 13.) Under Wexford's procedures, individuals incarcerated at Stateville request to meet with a nurse by submitting a "sick-call slip." (Cook Dep. at 26:9–18.) Cook met with several nurses during "sick call."

To start, on March 16, 2019, Mr. Cook complained to Nurse Lewandowski about ongoing pain in his left ear.[2] (DSOF ¶ 17; Decl. of Marlene Henze (hereinafter "Henze Decl."), Ex. 2 to

---

[2] While Nurse Lewandowski's name appears on several of Mr. Cook's medical notes, other nurses also spoke with Cook during various sick-call encounters. The parties have

2

DSOF [85-2] at COOK MR 000030.) Cook described the pain, which had been continuously present for a week, as a ten on a one-to-ten scale. (DSOF ¶ 17.) The nurse noted some hearing loss, though no drainage. (*Id.*) Nurse Lewandowski noted that Cook had a history of ear infections. (*Id.*; Henze Decl. at COOK MR 000030.) After examining his ear and finding it swollen and red, Nurse Lewandowski referred Cook for a doctor appointment and prescribed acetaminophen. (DSOF ¶ 17.)

On March 28, 2019, Plaintiff saw Physician Assistant LaTanya Williams regarding his ear pain. (*Id.* ¶ 18.) Williams's notes show that Cook reported the pain had been ongoing for about one week. (*Id.*) She also noted that he had a history of earaches as a child and that he had an earache seven months prior to their appointment. (*Id.*) It is not clear if Mr. Cook was housed at Stateville during this prior earache, and the record does not contain any medical records prior to March 16, 2019. During his appointment with Williams, Cook also complained of tonsil problems. (*Id.*) Williams noted "mild excoriation" in Cook's left ear canal and pockets on his tonsils, and she diagnosed Cook with possible tonsil stones.[3] (*Id.*) Williams prescribed Cortisporin eardrops and amoxicillin as needed for any infection.[4] (*Id.*) She also noted the need for Cook to consult with the Stateville dental department for a wash or rinse to address his tonsil pockets. (*Id.*) In addition, Williams provided Cook with educational materials regarding his diagnosis and her treatment plan. (*Id.*)

---

not identified the names of these other nurses (or several doctors whose notes are in the record), and the court is unable to decipher their signatures. When possible, the court identifies medical professionals by name and otherwise refers to them by title alone.

[3] Excoriation is a skin picking disorder. *See* https://www.webmd.com/mental-health/skin-picking-disorder. Tonsil stones "are hard, sometimes painful bits of bacteria and debris that get stuck in the nooks of your tonsils." *See* https://www.webmd.com/oral-health/guide/tonsil-stones-tonsilloliths-treatment-and-prevention.

[4] Amoxicillin is used to treat bacterial infections. *See* https://medlineplus.gov/druginfo/meds/a685001.html. Cortisporin drops can be used to treat outer ear infections caused by bacteria. *See* https://www.webmd.com/drugs/2/drug-3715-8196/cortisporin-otic-ear/neomycin-polymyxin-hydrocortisone-suspension-otic/details.

Mr. Cook's ear pain persisted, and, on April 21, 2019, he again complained of an earache to a sick-call nurse. (*Id.* ¶ 19.) According to the unidentified nurse's notes, Cook complained of cold, cough, or fever symptoms and again said his pain level was a ten out of ten. (Henze Decl. at COOK MR 000034.) The nurse noted that he had hearing loss in his left ear and could not hear her rub her fingers together; the notes do not say when Cook's hearing loss began. (*Id.*; DSOF ¶ 19.) The nurse prescribed Debrox—which, according to Dr. Henze, is a medication that removes excessive earwax through micro-foam cleansing—for Cook's ear buildup, and referred him for an ear flush. (DSOF ¶¶ 19, 20 (citing Henze Decl. ¶ 11).)

The next day, Cook again spoke with Nurse Lewandowski, telling her that he had an upcoming ear flush appointment but that he did not think he could wait any longer for pain relief. (DSOF ¶ 21.) Nurse Lewandowski examined his ear and found a "foreign body." (*Id.*) While the medical records do not specify what this "foreign body" was, Cook testified it looked like "a roach, a rodent." (Cook Dep. at 46:16–19.) Nurse Lewandowski sent Cook to the emergency health care unit for an immediate ear flush treatment. (DSOF ¶ 21.) According to a nurse's note from that appointment, the "foreign body was removed" without causing bleeding, swelling or redness, and Cook "did not verbalize any pain." (*Id.* ¶ 22; Henze Decl. at COOK MR 000036.) The following day, Cook again complained to Nurse Lewandowski of ear pain (this time a six out of ten), and she referred him for a doctor appointment. (DSOF ¶ 23; Henze Decl. at COOK MR 000038.)

On April 26, 2019, Mr. Cook saw an unidentified physician at Stateville who noted that Cook reported feeling like he was "under water" and complained of "irritation." (DSOF ¶ 24; Henze Decl. at COOK MR 000040.) Upon examination, the doctor recorded that Cook had superficial reddening in his left ear with mild crusting, along with congested sinuses. (DSOF ¶ 24.) The doctor prescribed Ofloxacin—which, according to Dr. Henze, is a medication used to treat outer ear and middle ear infections—and instructed him to return to the clinic for a follow-up appointment in 14 days. (*Id.* (citing Henze Decl. ¶ 17).)

4

Two days later, on April 28, 2019, Cook saw another nurse at sick call, who performed another ear flush in both of his ears. (*Id.* ¶ 25.) No ear wax was removed as a result of this flush, an otoscope exam showed clean bilateral ear canals, and the examiner noted that Cook's eardrums looked normal. (*Id.*) The nurse instructed Cook to follow up as needed. (*Id.*)

On May 22, 2019, Mr. Cook saw Ms. Williams again. (*Id.* ¶ 26.) He reported to her that his ear was still blocked and painful. (*Id.*) Williams examined the ear and found superficial redness, but no gross or obvious abnormality. (*Id.*) She noted that Cook had congested sinuses and prescribed Zyrtec, which, Williams explains, is an over-the-counter antihistamine used to relieve allergy symptoms. (*Id.*; Williams Decl. ¶ 21.) She then instructed him to follow up in one month. (DSOF ¶ 26.)

The record shows that Mr. Cook saw medical personnel five times in June 2019. On June 7, he complained of ongoing ear pain to a nurse, who noted that his ear was still infected and instructed Cook to go to sick call for a referral for a hearing screening. (*Id.* ¶ 27.) Cook followed these instructions and, the next day, reported to Nurse Lewandowski that his ear was still bothering him, and he reported the pain as a six out of ten. (*Id.*; Henze Decl. at COOK MR 000051.) Lewandowski took note of his earache and scheduled him for a follow-up appointment. (DSOF ¶ 28.) On June 12, Cook again saw Nurse Lewandowski and made the same complaints; the nurse reminded him that he was scheduled for a follow up later that month. (*Id.* ¶ 29.) On June 20, Cook saw Ms. Williams and told her that "nothing was working" and things "actually seemed to be getting worse" because he had pain on the left side of his throat. (*Id.* ¶ 30.) Williams examined Cook and found that he had swollen turbinates[5] but normal sinuses. (*Id.*) She noted his unresolved ear pain and prescribed Bactrim, an antibiotic used to treat bacterial infections, including those of the middle ear (Williams Decl. ¶ 26)); Nasacort, an over-the-counter nasal spray

---

[5] Turbinates are small structures in the nose. *See* https://www.webmd.com/a-to-z-guides/anatomy-of-the-nose-what-to-know.

5

used to treat allergies (*id.* at ¶ 27); and Zyrtec (DSOF ¶ 30). She also referred Cook for a consultation with the prison's medical director to discuss his ongoing ear pain. (*Id.*) On June 21, Cook asked a nurse at sick call for a hearing aid evaluation, and the nurse put in a hearing screening request. (*Id.* ¶ 31.)

Mr. Cook met with medical staff about his ear pain three times in July 2019. On July 4, he complained to a sick call nurse that he had not yet received antibiotics for his ear infection, and the nurse re-sent the prescription to the pharmacy. (*Id.* ¶ 32.) On July 7, he complained to Nurse Lewandowski of ear pain and puss on his tonsils; Nurse Lewandowski observed that Cook's throat was red, his tonsils were enlarged, his left hear was inflamed, and the left side of his neck was enlarged. (*Id.* ¶ 33.) She referred him to a doctor. (*Id.*) On July 10, Cook again saw Ms. Williams for his earache and sore throat, and complained that he had not received prescribed antibiotics, nor had he seen the medical director, despite being told he was scheduled to do so. (*Id.* ¶ 34.) Williams still observed some redness on Cook's right eardrum, swollen turbinates, and redness in his throat. (*Id.*) She noted he continued to suffer from ear pain and a sore throat, and she confirmed that the Bactrim prescription had been sent to the pharmacy, but re-sent his prescriptions nonetheless. (*Id.*) Williams also referred Cook to the medical director for evaluation of his chronic ear pain. (*Id.*) A week later, on July 17, Cook at last saw Dr. Bautista, whose notes say that Cook reported his pain had improved after taking Bactrim, which he must have picked up from the pharmacy in the preceding week. (*See id.* ¶ 35.) Dr. Bautista noted that pulling on Cook's ear caused him pain. (*Id.*) Based on his examination, Dr. Bautista continued Cook's prescriptions for Bactrim, Zyrtec, and Nasacort and informed him to follow up in two weeks.

At sick call on August 2, 2019, Mr. Cook told a nurse that despite his taking Bactrim as prescribed, his ear still hurt, and the nurse again scheduled him to see a doctor. (*Id.* ¶ 36.) When Cook saw Dr. Bautista on August 8, the doctor performed a hearing loss screening test. (*Id.* ¶¶ 37, 39.) Such a test is less precise than that used by an audiologist, but it showed that Cook

had a sensitive ear canal and that his left ear failed hearing at 500, 1000, and 2000 Hz.[6] (*Id.*) Dr. Bautista took note of Cook's left ear pain and filed a collegial review referral[7] for an offsite consultation with an ear, nose, and throat specialist ("ENT") at the University of Illinois, Chicago ("UIC"). (*Id.*) He also sought Wexford's approval for a hearing test to be performed by an audiologist. (*Id.* ¶ 38.) On August 13, 2019, following a review involving Dr. Bautista and Dr. Henze, Wexford approved both referrals. (*Id.* ¶ 40.)

Mr. Cook saw two off-site specialists in the fall of 2019. On October 30, he visited a UIC ENT doctor, who diagnosed him as suffering from mild, symmetrical sensorineural hearing loss and chronic TMJ pain.[8] (*Id.* ¶ 41; Henze Decl. at COOK MR 000160.) On November 1, he saw audiologist Lisa Steinwart for a comprehensive hearing test. (DSOF ¶ 42; Cook Dep. at 66:10–22.) The test showed that, despite what appeared to be normal ear canals and an "excellent" ability to understand speech, Cook had "moderate to severe" loss in his right ear and "severe to profound loss" in his left. (DSOF ¶ 42; Henze Decl. at COOK MR 000161.)

Back at Stateville, on November 7, 2019, a doctor diagnosed Mr. Cook with bruxism (teeth grinding) and TMJ pain. (DSOF ¶ 43.) The doctor referred him to the "ADA nurse" (a term not explained in the record) for hearing screening, and prescribed acetaminophen along with a mouth guard to use at night. (*Id.*) On November 20, Dr. Henze met with Cook, and she requested a collegial review discussion from Wexford about requesting bilateral hearing aids for Cook, which Wexford approved on November 26. (*Id.* ¶¶ 44, 45.)

---

[6] The parties do not explain the significance of these results, but the court's research suggests that human speech is usually 500 to 3,000 Hz. *See* https://medlineplus.gov/ency/article/003341.htm.

[7] Defendants do not explain this term, but the Seventh Circuit has noted that Wexford's " 'collegial review' policy . . . requires Wexford's corporate office to preapprove offsite care." *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 221 (7th Cir. 2021).

[8] Sensorineural hearing loss is caused by nerve damage in the inner ear. *See* https://www.webmd.com/healthy-aging/types-hearing-loss. TMJ pain is pain of the jaw joint and surrounding muscles. *See* https://medlineplus.gov/temporomandibularjointdysfunction.html.

Mr. Cook's ear troubles continued into the following year. On January 15, 2020, Cook again complained to a nurse at sick call, and the nurse scheduled him for another ear flush, which he received three days later. (*Id.* ¶¶ 46, 47.) The nurse who performed the ear flush extracted a long piece of toilet tissue from his ear and noted that he did not show redness or swelling after the flush. (*Id.* ¶ 47.) The nurse instructed Cook not to put toilet tissue or other objects in his ear. (*Id.*) The next week, on January 24, Cook told a nurse his ear pain was an eight out of ten. (*Id.* ¶ 48.) The nurse noted that, despite prior instructions, Cook had put toilet tissue in his ear.[9] (*Id.*) When he next saw Nurse Lewandowski, on February 6, he complained of ear pain (ten out of ten) and hearing loss; the nurse performed a hearing screening, warned him again not to put anything in his ear, and directed him to return if symptoms worsened. (DSOF ¶ 49; Henze Decl. at COOK MR 000174.) Cook had a similar interaction with another nurse on February 14. (Henze Decl. at COOK MR 000175.)

The last medical treatment reflected in the record occurred on June 30, 2020. On that date, Mr. Cook followed up with audiologist Steinwart for an evaluation of his hearing aids. (DSOF ¶ 50.) Steinwart found excessive wax in Cook's right year and instructed him on how to clean and care for his hearing aids. (*Id.*)

In September 2020, Mr. Cook commenced this lawsuit [1] and, on February 1, 2021, he filed the operative complaint [8]. Cook seeks relief under 42 U.S.C. § 1983, claiming that Defendants were deliberately indifferent in failing to provide adequate medical treatment, resulting in his pain and hearing loss. Dr. Henze and Ms. Williams, the only two individual Defendants remaining before the court, assert that their own and each other's medical treatment of Cook complied with the applicable community standard of medical care. (DSOF ¶¶ 51, 52; Henze Decl. ¶¶ 44–49; Williams Decl. ¶¶ 48–53.) They have stated opinions "to a reasonable degree of

---

[9] The court is uncertain why Cook put tissue paper in his ear (perhaps in an effort to absorb some drainage? because he hoped it would afford pain relief?), and neither party has explained this.

medical certainty," that the treatment they provided to Cook did not cause him harm. (Henze Decl. ¶ 48; Williams Decl. ¶ 52.) On June 8, 2022, Cook filed a motion for summary judgment [82]. On June 29, 2022, Defendants filed a cross-motion for summary judgment [84], arguing that Mr. Cook's claims against each named Defendant fail procedurally and on the merits.

## DISCUSSION

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In responding to a properly-supported motion for summary judgment, the adverse party must set forth "specific facts" rather than mere conclusory statements. *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). The court will deny summary judgment if, viewing the facts in the light most favorable to the nonmoving party, it finds a "genuine" factual dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Mr. Cook claims that Defendants violated his constitutional rights under the relevant standard: "If prison medical staff exhibit deliberate indifference to an inmate's serious medical condition, they subject her to unnecessary and wanton pain and suffering and thereby run afoul of the Eighth Amendment." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, a plaintiff must show that "(1) he had an objectively serious medical need (2) to which [the defendants] were deliberately indifferent." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021)).

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks omitted). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* at 459 (quoting *Gayton v. McCoy*, 593 F.3d 610,

9

620 (7th Cir. 2010)); *see also Reed v. McBride*, 178 F.3d 849, 852–53 (7th Cir. 1999). Mr. Cook's recurring ear pain and irritation, which he says resulted in hearing loss, satisfies this standard. (Pl.'s Mot. in Supp. of Summ. J. [82] at ¶¶ 9–14.)

The subjective element of a deliberate indifference claim requires a plaintiff to "show that the defendant 'actually knew of and disregarded a substantial risk of harm.'" *Mitchell*, 895 F.3d at 498 (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)); *see also Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017) ("A failure to act in the face of an obvious risk of which the official *should* have known is insufficient to make out a claim.") (emphasis in original). Under this standard, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quotation marks omitted). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)).

Mr. Cook unquestionably suffered ear pain, inflammation, and hearing loss. His unsuccessful efforts to obtain relief, over several months, were obviously frustrating. The record does not, however, establish deliberate indifference on the part of either individual Defendant. First, Ms. Williams, the Physician Assistant: The record shows that Cook saw Williams on four occasions in 2019, namely March 28, May 22, June 20, and July 10. On each occasion, Williams examined Cook, offered a diagnosis, and, as she found appropriate, provided advice and prescriptions. On the first visit, she prescribed ear drops and amoxicillin for possible infection; on the second visit, she observed only minimal redness near Cook's left hear and prescribed an antihistamine for allergies; on the third visit, she prescribed Bactrim to treat the ear infection and referred him for an appointment with the medical director; and on the fourth visit, she again referred Cook to the prison's medical director. Nothing about these actions is "so far afield of

accepted professional standards as to raise the inference that [they were] not based on medical judgment." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). For his part, Mr. Cook has offered no expert opinion or other information about the applicable standard of care for a physician assistant. Without such an opinion, it would be impossible for Cook to establish that Williams was negligent, let alone deliberately indifferent.

Nor does the record establish deliberate indifference on the part of Dr. Henze, the Medical Director at Stateville. The record identifies just three instances in which she was involved in Cook's healthcare decisions, and, on each occasion, she exercised professional judgment and took action to provide additional treatment for Cook. On August 13, 2019, Dr. Henze approved Cook's referral to a specialist at UIC. On November 20, she requested that Wexford approve Cook for hearing aids. And on November 26, following a "collegial review discussion" involving Dr. Henze, Wexford approved her request. None of these acts constitutes deliberate indifference.

Mr. Cook might well believe that medical staff should have referred him to an ENT or audiologist sooner. But to establish that the failure to do so violates the Constitution, Cook would need to present evidence from which a reasonable jury could find that the delay exacerbated his injury or unnecessarily prolonged his pain. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022); *see also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (noting that to prevail on an Eighth Amendment claim premised on delay, a plaintiff must introduce (1) evidence that the defendants' actions caused a delay in treatment and (2) verifying medical evidence showing that his condition worsened due to the delay). Had Mr. Cook argued that Dr. Henze or Ms. Williams delayed in referring him to an ENT, perhaps an expert could testify that earlier referral to an ENT could have prevented his hearing loss. Or, had Mr. Cook filed suit against persons responsible for delays, perhaps he could present evidence that more expedient treatment on the part of the sick-call nurses could have spared him needless ear pain. Because

Cook does not offer any such evidence, his claims against the individual Defendants fail as a matter of law.

That leaves Cook's claim against Wexford. The record does not support that claim, either, for two reasons. First, to hold Wexford liable, Mr. Cook must show an underlying constitutional violation, either against individuals or Wexford itself. Mr. Cook's claims against the individual Defendants fail for the reasons discussed above, and he has not alleged that Wexford's policies themselves exhibit deliberate indifference. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc) (acknowledging that an organization may be liable even when its individual agents are not, "if institutional policies are themselves deliberately indifferent to the quality of care provided"). In this case, at least, adherence to Wexford's "collegial review" policy did not result in Cook's being denied medical referrals.

Second, under current caselaw, as a private entity fulfilling government duties, Wexford is not vicariously liable for the conduct of its employees. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 765 (7th Cir. 2021); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Rather, such an entity may be liable for constitutional violations caused by "(1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policymaking authority." *Stockton*, 44 F.4th at 617. Although the Seventh Circuit has noted that this circuit's extension of *Monell* to private contractors may have "overlooked the *Monell* Court's special solicitude for municipalities and their budgets," the Seventh Circuit has not yet had a proper occasion to revisit this issue. *See Dorsey v. Varga*, 55 F.4th 1094, 1108 (7th Cir. 2022) (Hamilton, J., Concurring) ("In an appropriate case we should reconsider and overrule our precedents that have applied *Monell* . . . to private corporations like Wexford); *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 490 (7th Cir. 2022) (Hamilton, J., Concurring) (noting that "Supreme Court precedents do not require lower federal courts to extend the benefits of *Monell* to . . . private corporations). "For now, this circuit's case law still extends *Monell* from municipalities to private corporations." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). Consequently, because Mr.

Cook has offered no evidence to support his claim against Wexford under any of the *Monell* theories of liability, his claim against Wexford fails.

## CONCLUSION

For the reasons set forth above, Mr. Cook's summary judgment motion is denied [82], and Defendants' summary judgment motion is granted [84]. Judgment will be entered in favor of Defendants and against Cook.

ENTER:

Dated: February 9, 2023

REBECCA R. PALLMEYER
United States District Judge